MACY et al. v. BROWNE et al.

(District Court, S. D. New York. July 13, 1914.)

1. Food (§ 5*)—Importation—Tea—Statutes—"Quality"—"Purity."

Act March 2, 1897, c. 358, 29 Stat. 604 (U. S. Comp. St. 1901, p. 3194), to prevent the importation of impure tea, section 7, requires that the purity, quality, and fitness for consumption of tea shall be tested according to the usages of the tea trade, including the testing of an infusion of the same in boiling water, and, if necessary, chemical analysis.

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

*Held*, that the word "quality" referred to the grade or fineness of the leaf, depending principally on whether it was, when plucked, tender and young, or more mature, and also whether the plant producing the leaf was of the best kind, and that the term "purity" referred to the presence of foreign substances, without reference to whether it made the tea foul, since any adulterant, however cleanly or innocuous, would per se detract from purity.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.* For other definitions, see Words and Phrases, vol. 7, p. 5879.]

2. INJUNCTION (§ 11*)—GOVERNMENT OFFICERS—NECESSITY FOR RELIEF.
An injunction will not be granted restraining the federal tea board from denying admission to an importation of complainant's tea, because it showed presence of Prussian blue when subjected to the Read color test, in advance of a determination of the board not to admit it.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 9–11; Dec. Dig. § 11.*]

3. FOOD (§ 5*)—IMPORTATION OF TEA—CUSTOMS REGULATIONS.
Act March 2, 1897, c. 358, 29 Stat. 604 (U. S. Comp. St. 1901, p. 3194), provides for the inspection of tea importations, and requires that the purity and quality shall be tested according to the customs of the tea trade, including the testing of an infusion in boiling water, and, if necessary, chemical analysis. Thereafter the Secretary of the Treasury required examiners in the tea board to use the "Read method" to examine for artificial coloring, or facing matter, and provided that if the tea should prove inferior to standard in quality, quality of infused leaf, or artificial coloring or facing, it should be rejected, notwithstanding it be superior to the standard in some of the qualifications. *Held*, that such regulations did not deprive the tea board of all discretion to admit tea possessing coloring matter in harmless quantities, otherwise of superior quality, and which did not constitute an inferiority in purity or quality; the Secretary of the Treasury being without authority to compel the tea board to decide any question lawfully coming before it in any particular way.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

4. FOOD (§ 5*)—IMPORTATION OF TEA—DISCRETION OF TEA BOARD—CONTROL BY COURTS.
Whether tea offered for importation complied with the standard samples selected for determination of purity and quality, and whether a failure to comply with the standard in the matter of color or coloring matter alone should be considered an inferiority in purity or quality and justify exclusion, is a matter for the determination of the tea board in the exercise of its discretion, and is not a matter which the courts can control.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

In Equity. Suit by George H. Macy and others against George S. Browne and others. Bill dismissed.

Joseph H. Choate, Jr., of New York City, for complainants.
William L. Wemple, Asst. Atty. Gen., of New York City, for defendants.

HOUGH, District Judge. Complainants lately proferred for entry into the United States at the port of San Francisco certain tea, which the collector of that port rejected, as inferior in purity to the established standards, because of the presence in the imported tea of certain coloring matter. In so doing the collector acted in assumed

compliance with the "act to prevent the importation of impure and unwholesome tea," approved March 2, 1897, and of the regulations established by the Secretary of the Treasury pursuant to power conferred upon him by said statute. Thereupon complainants (pursuant to section 6 of the act) protested against the collector's decision,[1] and caused "the matter in dispute to be referred to a board of three United States General Appraisers." The three defendants herein are the General Appraisers (commonly called the "Tea Board") to whom complainants took what is practically an appeal from the collector's decision. The object of this suit is to obtain the directions of this court as to how the tea board shall decide the matter submitted to it pursuant to the statute, and on the motion of the complainants themselves. It would hardly be admitted by the draftsman of the bill that what I have just said fairly summarizes the purpose of suit, yet I think the justice of the comment will appear from analysis of proven facts and some study of the statute.

The act of 1897 provides for the annual establishment of standard samples of tea, to be kept in stock, at convenient ports of entry, and all teas "of inferior purity, quality, and fitness for consumption to such standards" shall not be brought into the United States. The ascertainment of fitness or unfitness is intrusted in the first instance to an examiner, and from his decision either the government or importer may "refer the matter in dispute" to the tea board. This board must consist of General Appraisers, whose general duties, tenure of office, and presumed qualifications are too well known to need further comment, but that the appraisers, when constituting the tea board, are vested with discretionary powers of at least a quasi judicial nature seems so plain as to require no more than statement.

[1] Admittedly, however, any test, inspection, or examination of tea, whether by a single examiner or the board, must be conducted in the manner prescribed by statute. Such prescription is found in section 7, which requires that the—

"purity, quality and fitness for consumption (of tea under investigation) shall be tested according to the usages and customs of the tea trade, including the testing of an infusion of the same in boiling water, and if necessary, chemical analysis."

The language quoted gains much in clearness, when something is learned of the growth, varieties, preparation, and marketing of the tea leaf.

"Quality," as used in this act, evidently refers to the grade or fineness of the leaf, depending principally on whether the leaf was, when plucked, tender and young or more mature, and also whether the plant producing the leaf was of the best kind or growing under favorable conditions.

"Purity" with equal clearness refers to the presence or absence of foreign substances, especially those which would be regarded as foul or dirty; but any adulterant, however cleanly or innocuous per se, would detract from purity.

1 The act requires the original test of tea to be made by an "examiner," but the action of the examiner I regard as an act of the collector.

"Fitness for consumption" is a phrase which in my opinion adds little, if anything, to the powers conferred, or limitations imposed by the statute; nor has the evidence shown any way in which tea can be unfit for consumption without also being woefully lacking in quality and purity.

The purity of tea has long been debased by "facing" or "coloring," or perhaps both simultaneously. Facing is often (if not usually) intended to increase weight, by the admixture of such materials as talc, etc. Coloring has long been thought desirable for "green" teas, of which the color of some (if not most) grades is obtained or improved by mixing Prussian blue, ultramarine, or indigo with the tea while it is being dried. One grain of Prussian blue will color seven pounds of tea; and this substance (which is the "lead" or writing part of a "blue pencil") seems the commonest pigment in use.

In some (at least) parts of China, the preparation of tea is carried on by small farmers, the leaves are dried in mud huts, in primitive ovens, and altogether under conditions necessarily resulting in the deposit of dust and "plain dirt" in the tea leaves. Teas having been colored for generations in these same huts, it is quite possible that forgotten particles of coloring matter may get into tea which it was not intended to color, i. e., change the appearance to the eye. In other words an uncolored tea may contain some coloring matter.

The customs authorities of this country have long tried to exclude colored teas; and the Secretary of the Treasury, having power under the statute to enforce "the provisions of this act by appropriate regulations," has required examiners and the tea board to use what is known as the "Read Method" to "examine for artificial coloring or facing matter." Reg. 22. It is further provided that—

"should a tea prove * * * inferior to the standard in any one of the requisites, viz.: Quality, quality of infused leaf, or artificial coloring or facing, *it shall be rejected* notwithstanding that it be superior to the standard in some of the qualifications." Reg. 23.

The Read method consists in calcining, under pressure of a spatula and on a piece of clean white paper, a small portion of the tea under investigation. If there be coloring matter (of the kinds above enumerated) in the tea, though in the smallest quantities, there will appear even to the naked eye, and certainly through a microscope of no great power, blue specks or streaks, on the paper, but ocular investigation will not show whether the blue color is that of ultramarine, indigo, or Prussian blue. The regulation then provides that the specked or streaked paper be sent to a chemist for identification of the pigment. As soon as such identification is made the tea must be rejected. If black paper instead of white be used, foreign materials other than blue colors will be detected. The identification of pigment by a chemist (it may be noted) cannot change the result; it makes no difference whether the speck turns out to be one blue dye or another, the tea must be rejected solely because it has coloring matter in it; kind is immaterial, and the quantity practically means any quantity, for the Read test is thorough, how thorough will hereafter appear.

When complainants offered their tea for entry, the standard samples

used by the government contained no coloring matter whatever, but (as shown by the evidence) did contain a far greater amount of other foreign substances than did complainants'. It is also proven that the tea refused entry is worth in the open market nearly four times as much per pound as is the standard sample by which its acceptance or rejection was gauged. I regard it as proven beyond doubt that the sole cause for rejecting the tea in question is that it showed coloring matter under the Read test—and a subsequent analysis, qualitative and quantitative, has revealed the presence of Prussian blue in proportions ranging (in the specimens examined) from 9 to 19 parts of blue in a million of other and unobjected to elements. There is an agreement of counsel that Prussian blue cannot be proved to produce any deleterious results; it is found mentioned in the United States Pharmacopœia as a drug sometimes used for common purposes, and in the quantities existing in this tea it might be arsenic without producing injury.

The foregoing findings of fact are not made because either court or counsel think this jurisdiction invoked to pass upon the sense or folly of rejecting tea such as that above described; these findings seem a necessary preliminary to justifying the original assertion that this action is brought to obtain directions for the tea board as to how to decide complainants' appeal.

Complainants' contention is this: (1) The act of 1897 limits the right of importing tea only in certain specified particulars; (2) the presence of coloring matter is not per se one of the specified grounds for rejection; (3) the only lawful reason for rejection is inferiority to the standard sample in purity, quality, and fitness for consumption, and such microscopic portions of Prussian blue as here shown do not constitute impurity, nor show unfitness in any way; (4) such inferiority, however, can only be ascertained in the specified statutory method, viz., by tests "according to the usages and customs of the tea trade, including the testing of an infusion * * * in boiling water, and, if necessary, chemical analysis"; (5) the Read test was unknown to the tea trade in 1897, being admittedly of more recent invention, and it is not a chemical analysis.

Asserting these premises, the bill prays that the tea board be compelled by mandatory injunction: (a) Not to use the Read test; and (b) not to base its decision on the "mere presence of material adapted for use as coloring, irrespective of whether said matter is harmful." Plainly if the tea board were shown everything proven in this court, and then restrained from considering the Read test, it would be aware that there was coloring matter in harmless quantities in the tea, and if it were then directed to disregard that fact, there would be nothing left except evidence that the complainants' tea was better and cleaner and more valuable than the standard, and must be admitted. If this in effect is not asking this court to sit as a tea board, I fail to understand the bill. Of course the request is to sit in more than one case, for the decree prayed for would be a guide for all subsequent cases of color in tea.

The form in which an action is brought is oftentimes still determinative of its fate. This suit is for injunctive relief, and there are, I am

sure, several reasons why that form of relief cannot and should not be granted.

[2] If it is ever right to coerce or guide the decision of any tribunal, an opportunity must surely first be given for the defendant organization to do something—it must have a chance to do right before it is assumed to be about to go wrong. This action asserts error before it is committed, and for this reason alone I should refuse injunction.

[3] This argument complainants seek to avoid by pointing out that regulations 22 and 23 deprive the tea board of all power to pass upon the "purity" and "quality" of tea if the Read test shows color, for when that occurs "it shall be rejected." If this be the intent of the regulations, they are in my opinion futile, for the powers of the tea board are derived from the statute itself—it is quite independent of the Secretary, and bound to hold (if such is the opinion of its members) that the presence of coloring matter in harmless quantities does not constitute an inferiority in purity or quality. The Secretary can no more compel the tea board to decide any question lawfully coming before it in any particular way than he can so act toward any other lawfully constituted tribunal.

[4] The real question presented to the original examiner, to the tea board, and sought to be laid before this court, is whether the standard samples of tea are to be interpreted (so to speak) narrowly or broadly. The samples are chosen by a board of experts (section 2), who are not employés of the Treasury for any other purpose. They have chosen a standard sample which is neither colored nor contains color, so that the real question is whether failure to comply with the standard in the matter of color or coloring matter alone is to be considered an inferiority in purity or quality. This is emphatically a matter of opinion, of discretion.

The conclusion that the matter in dispute is one of discretion leads me to dispose of this case by a reference to the recent decision of the Supreme Court in State of Louisiana v. McAdoo, 234 U. S. 627, 34 Sup. Ct. 938, 58 L. Ed. 1506 (June 22, 1914). As the matter is there put, the courts "will refuse to substitute their judgment or discretion for that of the official intrusted by law with its execution." It is enough if the act to be enforced by mandamus or forbidden by injunction be not ministerial; this question of tea is plainly not that. I have refrained from considering whether the Board of General Appraisers is not entitled to the further protection accorded to a judicial body.

The cases cited in the decision just mentioned render any further citation unnecessary. To sum the matter up, a court of equity may lawfully be asked to compel a public official to do an act plainly required of him by law, but that official can never be judicially told how to think. If he be empowered ministerially only, what he thinks is immaterial; if the law tells him to think and act on his opinion, any judicial advice is in its turn immaterial and indeed impertinent.

As the bill must be dismissed for lack of equity, it is not necessary to consider the inquiry whether the Read test is a chemical analysis. It may, however, be pointed out that an unquestioned chemical analysis of complainant's tea, both qualitative and quantitative, has been made,

and the result put in evidence. What is important is the truth, not the way of getting at it. The effect of that proven truth is for the tea board, not this court.

Bill dismissed.