William E. Ringel, J.
This ease involves the hamburger — that ubiquitous meat dish, the piece de resistance of every roadside eatery (H. L. Mencken, The American Language [4th ed.], *747 pp. 155, 220). Imported from Northern Germany, hamburger is nothing’ more than finely ground beef served with seasoning, in small patties, either grilled or fried. (2 Craigie, Dictionary of American English, p. 1211.) Though this definition is very close to the official definitions given by the United States and New York State Departments of Agriculture (post), untold numbers of hamburger aficionados insist that this definition is too limited in both its -scope and content.
Be that as it may, the hamburger originated in the German city of the same name, and hence its toponymic appellation (Oxford English Dictionary — Supp., 1933). There, in North Germany, the stalwart natives consumed it in the raw state, under the name of Steak Tartar, often garnished with raw onions. (“Why We Say”, by Robert L. Morgan, 1953, p. 68.) In Germany this chopped beef delicacy was known, not as hamburger, but as Deutsches (German) Beefsteak. (M. S. Italia, Deutsches Kochbuch, p. 20.) It acquired the name of hamburger only upon its arrival to these shores, where it has been widely accepted as a mainstay of our diet (Morgan “ Why We Say ”, ibid.), though as one wit has said, much has been lost in the translation.
But whatever its history and etymology, hamburger has been known and recognized in this country since the latter part of the 19th century. It first appeared in print as 11 hamburg steak ” in the Boston Journal of February 16, 1884 (Matthews, Dictionary of Americanisms). Craigie (ibid.), says it was defined in 1892. George Ade (1901), in his “ 40 Modern Fables ”, page 285, and Irvin S. Cobb (1912) in his “ Back Home ”, page 147 (two well-known American humorists albeit writers in a different genre), both mention “ hamburger ” in haec verba. All the authorities cited above indicate that the various names given to this product, to wit, hamburg, hamburger, hamburg steak, hamburger steak, are all synonymous.
With such a history, it was inevitable that the ‘ ‘ hamburger ’ ’ would find its way into a court of law (as distinguished from a court of equity and its “ clean hands ” doctrine). And it was equally inevitable that some Judge would be called upon to compose some learned tome on food, with hamburger in the stellar role.
Not that food is a subject completely foreign to the judiciary. The very word “ Coke,” (the name of that pre-eminent English jurist), was but another way of spelling “ Cook,” in ancient England; and cooks (that is good cooks), were greatly honored for their art, as far back as the days- of William the Conqueror *748 (Encyclopaedia Britannica [14th ed.], vol. 6, pp. 367, 368), though few tourists in modern England today, would believe it.
Modern cookery, this same Encyclopaedia tells us, dates back to the Renaissance. And the greatest name in the literature of cookery and gastronomy is none other than Anthelme Brillat-Savarin, the French jurist and author of Physiologic du Gout (Encyclopaedia, ibid, vol. 6, p. 367).
The English judiciary, not to be outdone by their French brethren, proved their sensibilities to kitchen and palate, through one Thomas Walker, a Police Magistrate of Lambeth who in 1835, produced a treatise on the art of cookery (the original), and inspired others to follow. (Encyclopaedia, ibid., vol. 6, p. 367.)
Modern gastronomists have always abjured Moliere’s epigram: “We eat to live, we do not live to eat.”
These modernists like La Rochefoucauld believe that “ eating intelligently is an art,” and like Vauvenargues believe that “great thoughts come from the stomach,” (Encyclopaedia, ibid., vol. 10, p. 56) which leads us to conjecture as to the size of the girth of those Judges who propounded the rule in Shelly’s case, and the Rule against Perpetuities.
Modern cooks and gastronomists are men of many parts, physically and philosophically. The works of Brillat-jSavarin and Thomas Walker were no mere cookery books. They also contained a compound of observations and philosophy (Encyclopaedia, ibid., vol. 6, p. 367). Witness the bold concepts of one cook: ‘1 When an unfamiliar harmony of flavours forms itself on the palate, we should try to analyze the sensation just as we identify the different instruments in an orchestra. This is the right way to train our taste. We shall create new sources of pleasureable sensation, and we may even enrich humanity by fresh progress in the culinary art.” (Encyclopaedia, ibid., vol. 10, p. 58.)
Perhaps this experimentation can go too far. Frederick the Great, for instance, added champagne and mustard to his coffee to give it a stronger taste (Encyclopaedia, ibid., vol. 10, p. 57).
The modern Irish have done much better with their coffee.
How much, and to what degree, the defendants, in this case, were inspired by these lofty sentiments to experiment in the culinary arts, we do not know. Whether they sought to outdo Savarin and Escoffier, to become the Brahms, Beethoven and Bach of the modern kitchen or the George Gershwin of Gotham, we likewise do not know. Nor can we tell how much of their experimentation was inspired by the Muses or by Midas.
*749 But what we do know is that they stand charged with processing, possessing and offering for sale hamburger which was adulterated and misbranded.
The facts in this case are as follows:
The defendant Schneider owned and operated a food store, commonly known as a supermarket. The defendant Enders was employed by him as a butcher. It was Enders ’ duty to prepare for its customers, the various meats, including chopped meats and hamburgers, sold in this establishment.
On January 17,1962, during a routine inspection of the defendants’ store, an inspector from the New York City Department of Markets observed the defendant Enders adding some edible beef blood to a special two-pound order of hamburger to be prepared from chuck beef, for which a customer was waiting.
There were two one-gallon cans of edible beef blood in the room where Enders was working. From one of these cans Enders poured this blood to the hamburger, with the knowledge and consent of the codefendant ¡Schneider. When questioned, both defendants stated the beef blood was added only to the cheaper variety of hamburger ‘ ‘ to juice it up. ’ ’
The defendant Schneider sold various kinds of meat and meat products, among which were three grades of hamburger. The cheapest grade was made from beef trimmings and sold for 39 cents a pound. The next grade was made from chuck beef and sold for 89 cents a pound. We are not concerned with the third grade of hamburger, which is the best grade, and which is made from beef round. It was a preparation of the chopped chuck beef that Enders was preparing at the time he was observed adding the beef blood.
Hamburger is made by chopping or grinding fresh beef. Both the Federal and State definitions of hamburger (post) are substantially identical.
The beef blood, added to the meat involved, was nondeleterious, unadulterated and approved for human consumption by the United States Department of Agriculture. The use of such beef blood, per se, is not prohibited by either the Federal, State or city Governments. Its use is approved in the preparation of certain meat products, such as bloodwurst (see New York City Health Code, § 95.01, subd. [b]).
The facts further disclosed that there is no known method of determining how much blood is indigenous to any carcass or particular piece of meat, or how much blood, if any, may have been added. The amount of blood in any carcass varies among the carcasses of animals, even from the same species and genus. *750 Nor is there any uniformity in the distribution of blood in any one carcass, though generally, more blood will be found in the neck than in any other portion of its body.
Thus, with respect to the ground chuck beef hamburger in question, selling for 89 cents a pound, as well as the two .samples of 39-cent hamburger (People’s Exhibits Nos. 4 and 5) .seized by the inspector, there is no known method of determining how much blood was indigenous and how much blood had been added thereto. Additionally, these two Exhibits, Nos. 4 and 5, were never analyzed and their actual contents are unknown.
, • The analysis of the chuck beef involved, however, disclosed a moisture content of 60.5% and a fat content of 22.5%. The People concede that these percentages are within the established norms.
The information filed against these defendants charges them both, with violations of the New York State Agriculture and Markets Law, a misdemeanor, in that they ‘ ‘ unlawfully did process, possess, sell, offer and expose for sale * * * ground meat, which was adulterated and misbranded, in that a substance had been added thereto and mixed therewith to make it appear better than it is and of greater value than its true value, and which ground meat fell below the standard of purity, quality and strength which it purported and was represented to possess.”
Section 199-a of the Agriculture and Markets Law prohibits the possession, processing, offering or exposing for sale any article of food which is adulterated or misbranded.
Section 200 of the same law defines adulteration of food, and section 201 defines misbranding. The applicable portions of these sections state as follows:
“ § 200. Adulteration of food. Food shall be deemed to be adulterated: * * * 10. If any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength or make it appear better than it is or of greater value than its true value.
‘ ‘ 11. If it falls below the standard of purity, quality or strength which it purports or is represented to possess.
‘ ‘ § 201. Misbranding of food. Food shall be deemed to be misbranded: * * * 7. If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed, unless (a) it conforms to such definition and standard, and (b) its label bears the name of the food specified in the definition and standard, and, in so far as may be required, the common names of optional ingredients present in such food.
*751 “8. If it purports to be or is represented as (a) a food for which a standard of quality has been prescribed by this chapter or by regulations as provided in section two hundred fourteen-b, and its quality falls below such standard, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard * * *
‘ ‘ § 214-b. Regulations. The authority to promulgate regulations for the efficient enforcement of this article is hereby vested in .the commissioner. This article and the regulations promulgated thereunder shall be so interpreted and construed, however, as to effectuate its general purpose to enact state legislation uniform with the federal act approved June twenty-fifth, nineteen hundred thirty-eight, and all acts amendatory thereof and supplemental thereto.
“ The commissioner is hereby authorized (1) to adopt, in so far as practicable, the regulations fixing and establishing definitions and standards of identity and/or standards of quality, and tolerances, for foods or food products from time to time promulgated under the federal act or acts, and (2) to change or amend the regulations promulgated under this chapter fixing and establishing definitions and standards of identity, and/or standards of quality, and tolerances, so as to conform in so far as practicable, to those promulgated under the federal act or acts.”
Pursuant to the authority thus vested in him by section 214-b the Commissioner of Agriculture and Markets on October 8, 1941, promulgated the following definitions, rules and regulations with regard to meat and meat products:
“ (2) Meat. The properly dressed flesh derived from cattle * * * with or without the accompanying * * * blood vessels, which normally accompany the flesh and which may not have been separated from it in the process of dressing it for sale.” * * *
“ (4) Beef. Meat derived from cattle nearly one year of age or older.” * * *
“ (11) Hamburg steak. Hamburg steak — comminuted fresh beef, with or without addition of suet and/or seasoning.” (1 NYCRR 257.1.)
The Federal Government defines hamburger as follows: “ Hamburger shall consist of chopped fresh beef, with or without the addition of beef fat as such and/or of seasoning, and shall not contain more than 30 percent of fat.” (Code of Fed. Reg., tit. 9, § 17.8, subd. [35].)
*752 As stated in section 214-b the purpose of these definitions and regulations and these statutes was to conform State legislation as closely as possible to Federal legislation,* so that the public would be protected. (Catalanello v. Cudahy Packing Co., 27 N. Y. S. 2d 637, 641.) In the Catalanello case the court said: “The court holds that the legislature of the state of New York, when it amended the Agriculture and Markets Law, effective September 1,1939, intended to conform the State law to a similar Federal statute, 21 U. S. C. A. § 301 et seq.” And at page 642: ‘ ‘ These statutes were passed for the very purpose of protecting and safeguarding the consuming public.”
A distillation of all of the evidence in this lengthy trial can, in its essence, be summed up as follows. The meat in question, hamburger, has had edible beef blood added to it by the defendants. The beef blood is nondeleterious and has been approved, for human consumption, by the United States Department of Agriculture. The People claim that the addition of this beef blood to hamburger constitutes adulteration and misbranding under the statutes. The defendants (in addition to other special defenses which will be discussed later) say it does not. The theory of the case as presented to the court, by both sides is thus a comparatively simple one.
Due to a dearth of New York State appellate court cases on the questions before us, frequent recourse must be made to Federal court decisions. This is logical and appropriate since our State statutes on adulteration and misbranding are intentionally patterned on the Federal Food, Drug and Cosmetic Act. (U. S. Code, tit. 21, § 301 et seq., especially §§ 341, 342; Catalanello v. Cudahy Packing Co., 27 N. Y. S. 2d 637, supra.)
Subdivision 10 of section 200 says a food is adulterated if any substance has been added thereto or mixed therewith so as to (1) increase its bulk or weight or (2) reduce its quality or strength, or (3) make it appear better than it is or of greater value than its true value.
Let us first examine the 1 ‘ adulteration ’ ’ statute, with particular reference to subdivisions 10 and 11 thereof.
*753 What does the word “ adulterate ” mean?
The American College Dictionary defines this word “ To debase by adding inferior materials or elements; make impure by admixture; use cheaper, inferior, or less desirable goods in the production or marketing of (any professedly genuine article); to adulterate food.”
Webster’s New International Dictionary (2d ed.) defines 6 ‘ adulterate ”: “ Figuratively, to make corrupt or impure by adding new, strange, or foreign elements.” (Defiance Milk Prods. Co. v. Du Mond, 285 App. Div. 337, 343.)
In the case of United States v. 716 Cases, etc. (179 F. 2d 174, 176) the court, in a case involving section 342 (subd. [b], par. [2]) of title 21 of the United States Code, speaking of adulteration said: 1 ‘ The test of adulteration within the meaning of the Act does not turn upon whether the article is non-injurious and fit for human consumption. The Act was not intended to be confined to misbranding and the addition of adulterated substances deleterious to the health of consumers. It provides protection to the consumer from ‘ economic adulteration ’ by which less expensive ingredients are substituted, or the proportion of more expensive ingredients are diminished so as to make the commonly identified article inferior to that which the consumer would expect to receive when purchasing it, although not in itself deleterious.”
The American College Dictionary also gives us the following word definitions: ‘£ weight ’ ’ is defined as ‘ ‘ amount of heaviness ”.
“ Quality” means “ character or nature, as belonging to or distinguishing a thing; character with respect to excellence, fineness etc. or grade of excellence: food of poor quality.”
In the ease of Macy v. Browne (215 F. 456, 458 [S. D. N. Y.]) the court held that “ Quality ” “ refers to the grade or fineness of the leaf [tea leaf], depending principally on whether the leaf was, when plucked, tender and young or more mature, and also whether the plant producing the leaf was of the best kind or growing under favorable conditions.”
The testimony was clear that Enders added the blood to the hamburger and then weighed the meat. This meat sold for 89 cents per pound. Even if only one-half ounce avoirdupois had been added (a small amount indeed), the customer would have paid some 2% cents for nonindigenous blood. Nor was this chopped beef of such a character, excellence and fineness .that she should have received or which she expected, when she ordered it, by reason of the addition of alien blood.
*754 Under .these facts, the court holds that the addition of the non-indigenous beef blood to the hamburger, constituted adulteration under subdivision 10 of section 200.
Whether or not this added beef blood made the hamburger appear better than it was or if greater value than its true value, is immaterial. (Cf. People ex rel. Bennett v. Sterling Amherst Farms Dairy, 265 App. Div. 672; People v. Lefkoff, 147 Misc. 70.) In neither of these cases, does it appear that a definition and standard of identity of the products involved, had been established, see post.)
How let us examine subdivision 11 of section 200. Does the addition of the nonindigenous beef blood cause the hamburger to fall below the standard of purity which it purports or is represented to possess1?
The word “ purport” should be given its usual ordinary meaning. Webster’s Hew International Dictionary (2d ed.), defines the word as follows: “To convey, imply, or profess outwardly, as one’s (esp. a thing’s) meaning, intention, or true character; to have the appearance, often the specious appearance, of being, intending, claiming, etc. (that which is implied or inferred) (United States v. 30 Cases etc., 93 F. Supp. 764, 769, and cases cited therein.)
“ Purity” is defined (American College Dictionary) as 1. ‘ ‘ the condition or quality of being pure; freedom from extraneous matter or from anything that debases or contaminates; the purity of drinking water. 2. freedom for any mixture or modifying addition. 3. freedom from foreign or inappropriate elements. ’ ’
In Macy v. Browne (215 F. 456, 458, supra) the court held that the term “ Purity ” referred to the presence or absence of foreign substances without reference to whether it made the tea foul, “ but any adulterant, however cleanly or innocuous per se, would detract from purity.”
Thus the addition of the nonindigenous beef blood to the hamburger caused the hamburger to fall below the standard of purity (and quality), which it implied it represented and thus likewise constituted adulteration.
The next question presented is whether the hamburger in question was misbranded. In essence subdivision 7 of section 201 says a food shall be deemed misbranded “If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed, unless (a) it conforms to such definition and standard, and (b) its label bears the name of the food specified in the definition and standard
*755 Subdivision 8 of section 201 outlaws such food “ [i]f it purports to be or is represented as (a) a food for which a standard of quality has been prescribed by this chapter or by regulations as provided in section two hundred fourteen-b, and its quality falls below such standard, unless its label bears, in such manner and form as such regulations specify, a statement that it falls below such standard".
The term “ definition and standard of identity” means that some duly authorized authority has fixed the ingredients that may go into any food, including a reasonable standard of quality. (62 Cases of Jam v. United States, 340 U. S. 593; cf. U. S. Code, tit. 21, § 341.)
Under section 341 of title 21 of the United .States Code a product may not be introduced into interstate commerce unless it is composed of those ingredients fixed under the definition and standard of identity for the food in question. (62 Cases of Jam v. United States, supra; Security Administrator v. Quaker Oats Co., 318 U. S. 218.)
One of the chief purposes of this section (ibid.), is to promote honesty and fair dealings in behalf of the consumer and was not intended to promote the consumer’s health or to educate the public as to dietary requirements. (Quaker Oats Co. v. Federal Security Administrator, 129 F. 2d 76, 81, revd. on other grounds 318 U. S. 218.)
In the case of Libby, McNeill & Libby v. United States (148 F. 2d 71, affg. 55 F. Supp. 725) the food product involved was tomato catsup. The catsup complied with the definition and standard of identity for tomato catsup, with one exception. That exception was that benzoate of soda had been added, a preservative not permitted by the standard. The catsup was labeled as catsup with preservative and was sold truthfully labeled. Nevertheless the lower court decree of condemnation was affirmed, based on the failure of the product to comply with the standard because of the presence of the benzoate of soda. The purpose of the act, it was held, was not confined to a requirement of truthful and informative labeling. The appropriate inquiry is whether the ultimate purchaser will be deceived. (See, also, United States v. 20 Cases of Buitoni, 130 F. Supp. 715.)
Following the reasoning in the Buitoni case, even if a label had been affixed on the chopped beef which purported to be hamburger, which label stated that edible beef blood had been added, the product in question would have been violative of section 201. As the court said (p. 719) in the Buitoni case, to permit otherwise “ then the fixing of a standard for commonly *756 known foods becomes utterly futile as an instrument for the protection of the consuming public.” At page 719 in the Buitoni case the court added: “I do not read the opinion as limiting the scope of the Quaker Oats decision — i.e., § 343 (g) is ‘ not confined to a requirement of truthful and informative labeling. ’ ’ ’
It is therefore the finding of this court that the hamburger made from the chuck chop beef was adulterated and misbranded.
There is not sufficient evidence, as a matter of law, to warrant a finding that the two packages of 39-cent hamburger are either adulterated or misbranded.
Having reached the conclusion that the food in question was adulterated and misbranded we must now determine the criminal responsibility, if any, of each defendant.
Schneider says he cannot be held responsible for Enders’ acts because he was not present when Enders added the beef blood. This defense is without merit. Enders was his employee, working in his place of business. It was his duty to inquire into the conditions prevailing in his establishment. He is chargeable with the sufferance of the illegal acts committed by those in his employ. (People v. Lewis, 138 App. Div. 673; People ex. rel. Price v. Sheffield Farms Co., 225 N. Y. 25; People v. Mancuso, 255 N. Y. 463.) Additionally it might be noted, that Schneider was fully aware of what Enders was doing.
Enders also claims that he cannot be held criminally responsible because he was merely a butcher employed by Schneider and had no “ responsible share ” in the operation of the supermarket. However, he was the one who processed the outlawed hamburger, an act, which the statute (§ 199-a) also interdicts.
“ The word ‘ process ’ is defined as ‘ a mode of treatment of certain materials to produce a given result. It is an act, or series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing.’ ” (Rawls, Inc., v. Peck, 159 Ohio St. 336, 338.)
The act of chopping a chunk of meat into small pieces, by means of a meat grinder, thus substantially altering its original form, and intending that result, constitutes “processing” of food within the meaning of the statute.
Enders extends this argument in his defense one step further. He alleges, that assuming he did the acts complained of, he cannot be held criminally responsible since he was a mere employee and as such, shared no responsibility in the business process resulting in the alleged unlawful processing of the offending food. In support of this contention he cites United *757 States v. Dotterweich (320 U. S. 277). That ease involved the guilt of an employee for the shipment of misbranded and adulterated drugs in interstate commerce, in violation of section 301 of the Federal Food, Drug, and Cosmetic Act (U. S. Code, tit. 21, § 331). Dotterweich was the president and general manager of his employer’s business.
In affirming his conviction, the court in an opinion by Mr. Justice Frankfurter -stated (pp. 284-285) that all .those persons commit the offense charged “who do have such a responsible share in the furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs. Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting. * * * Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless.
“ It would be too treacherous to define or even to indicate by way of illustration the class of employees which stands in such a responsible relation. To attempt a formula embracing the variety of conduct whereby persons may responsibly contribute in furthering a transaction forbidden * * * would be mischievous futility.”
The same reasoning should apply in cases involving the processing of outlawed foods. Enders was the butcher employed by Schneider. Enders apparently was in charge of preparing the hamburger in Schneider’s shop. Orders for hamburger, were relayed to him by sales personnel who waited on customers in the shop above the basement, where Enders did his work. The order he received carried no instructions to add beef blood. This act he did on his own and he did it willfully. When questioned, Enders said he only used the beef blood on 39-cent hamburger “ to juice it up.” The hamburger involved, however, was of the 89-cent brand.
Enders was no novice in the butcher business. He had a long history of employment as a butcher, including the office of Chief Petty Officer in the Merchant Marine, where he taught that skill.
In this case before us he knew he was preparing an order for a customer who was waiting for it. He knew that upon the completion of that order, that it would be delivered to that customer. Of course he had no responsible share in operating Schneider’s supermarket, but he did have a very “ responsible *758 share in the furtherance of the transaction which the statute outlaws ”, namely processing adulterated and misbranded food. (United States v. Dotterweich, 320 U. S. 277, 284, supra; italics supplied; United States v. Kaadt, 171 F. 2d 600, 604.)
As Frankfurter, J. said, in Dotterweich (supra) one cannot formulate hard and fast rules as to who is and who is not responsible “ in the furtherance of the transaction ” prohibited. But under the facts in this case, certainly Enders comes within the ambit of the statute. To hold that under these facts that such a defendant was not culpable would result in untold mischief and would render the statute a nullity.
Hamburger is big business. Three out of every 10 pounds of meat consumed in the city are hamburger. (New York Times, Feb. 7, 1962, p. 26.) Since the days when the first hamburger sandwich made its appearance at the St. Louis Fair in 1904 (‘ ‘ Hamburger Cook Book, ’ ’ by Esther K. Schwartz), hamburger as a sandwich and otherwise has become one of the most popular menu items, not only at roadside stands, but also in regular restaurants. Its popularity has grown so great that many restaurants specialize in serving hamburgers. Even the patriotic fervor engendered by two World Wars with Germany did not diminish the demand for hamburger, though some restaurants after World War I changed the name of hamburger steak to Salisbury steak, and hamburger sandwich to Liberty sandwich. (Mencken, American Language, supra, [1st Supp.], p. 429.) All this is a matter of common knowledge.
It is this widespread demand for hamburger, and the ease with which it can be adulterated, that has inspired regulatory legislation by both the Federal and State Governments. (Annual Report of New York State Agricultural Department, 1939, p. 43.)
The protection against deception, of the consuming public, demands strict compliance with these laws. While it is true that certain individuals may be .subjected to what may appear to be drastic consequences, yet this protection must remain paramount. (United States v. Dotterweich, supra; United States v. Balint, 258 U. S. 250; Shevlin-Carpenter Co. v. Minnesota, 218 U. S. 57.)
The rule of caveat emptor may still apply in many fields of law. However, in this field dealing with foods, the rule now is let the seller beware.
Motion to dismiss the information and to acquit the defendants is denied as to each defendant. Each defendant is found guilty as charged.

 Section 343 of title 21 of the United States Code reads in part as follows: “A food shall be deemed to be misbranded * * * (g) * * 9 If it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341 of this title, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring) present in such food.”